# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

**No. 22-0559V**

|  |  |
|---|---|
| ROCIO BLANCO,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 18, 2025 |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA, for Petitioner.*

*Mitchell Jones, U.S. Department of Justice, Washington, DC, for Respondent.*

## <u>DECISION AWARDING DAMAGES</u>[1]

On May 23, 2022, Rocio Blanco filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination she received on August 29, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages figure.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **<u>$118,002.58</u>**, comprised of $113,000.00 for actual pain and suffering plus $5,002.58 for past unreimbursed expenses**.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Even though the matter was conceded, the parties reached an impasse in their discussions regarding damages. ECF No. 26. Petitioner then filed a Motion for Ruling on the Record ("Mot.") on January 4, 2024. ECF No. 31. Respondent filed a response ("Resp.") on February 23, 2024 and Petitioner filed a reply ("Repl.") on March 28, 2024. ECF No. 32-34. On July 12, 2024, Petitioner filed a Supplemental Brief ("Supp.") in which she requested reimbursement for out-of-pocket expenses for "post-surgery rehabilitation" equipment. ECF No. 36.

I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 37. That hearing was held on November 22, 2024,[3] and the case is now ripe for a written determination.

## II.    Relevant Medical History

Petitioner was 27 years old when she received a flu vaccine in her left arm on August 29, 2019 at an urgent care in Pasadena, CA. Ex. 2 at 1; Ex, 3 at 126. She recalled that she had pain and swelling in her left shoulder within hours of her vaccination, and within a few days her range of motion had decreased to the point that she had difficulty lifting her arm. Ex. 1 at ¶6

On September 9, 2019 (11 days post-vaccination), Petitioner returned to urgent care with bruising and itching at the injection site. Ex. 3 at 138. She also complained of dizziness, headaches, and abdominal cramping. *Id*. On exam, Petitioner had a rash with pain on her left upper arm and was diagnosed with cellulitis. *Id*. at 141. She was prescribed Bactrim and prednisone. *Id*.

The following day, Petitioner sent a message to the provider informing him that her whole arm was sore and that she couldn't lift it much due to pain. Ex 3 at 189. She was advised to follow up with her primary care provider ("PCP") or urgent care. *Id*. She returned to urgent care on the evening of September 10, 2019. *Id*. at 173. She reported continued pain and intermittent numbness on the left side of her body. *Id.* Petitioner's left shoulder was tender to palpation and her flexion was limited to 90 degrees. *Id*. at 174. She was prescribed naproxen and advised to consider physical therapy if her symptoms persisted. *Id*. at 175.

---

[3] At the end of the hearing held on November 22, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

Petitioner saw her PCP on September 12, 2019. Ex. 4 at 4. She reported pain immediately after her flu shot on August 29. *Id*. The doctor noted that Petitioner's deltoid was warm and swollen. *Id*. She was given an antibiotic injection and doxycycline. *Id*. Petitioner returned the following day with complaints of having trouble sleeping due to her shoulder pain. *Id*. at 3. She was given another antibiotic injection and referred for an MRI. *Id*.

Petitioner had a left arm MRI on September 14, 2019 that was unremarkable. Ex. 4 at 6. Her shoulder MRI the same day revealed mild tendinosis, possible mild biceps tenosynovitis, and findings possibly indicating a predisposition to subacromial impingement. *Id*. at 8-9.

On October 3, 2019, Petitioner saw another family medicine doctor. Ex. 3 at 192. She complained of left shoulder pain, rated 8/10, since her flu vaccine that was preventing her from sleeping. *Id*. at 195. She reported left hand weakness, numbness in her left upper extremity, and limitations in range of motion. *Id*. On exam, she had significantly reduced range of motion, with abduction to 45 degrees, positive impingement testing, and reduced strength. *Id*. at 196. She was prescribed naproxen and referred to orthopedics. *Id*. at 197.

On October 7, 2019, Petitioner saw an orthopedist for evaluation. Ex. 3 at 217. She reported left shoulder pain, decreased range of motion, and weakness, as well as new right shoulder pain. *Id*. She rated her pain as 8/10. *Id*. On exam, there was diffuse tenderness to palpation, reduced active range of motion, and good rotator cuff strength. *Id*. X-rays were negative. *Id*. Petitioner was diagnosed with left rotator cuff syndrome, given a cortisone injection, and referred to physical therapy. *Id*. at 218.

Petitioner began physical therapy on October 11, 2019 and had 4 sessions through November 1. Ex. 3 at 261-322. Her six-year-old son came to the initial appointment with her. *Id*. at 262. The assessment was "acute stage" rotator cuff syndrome with "muscle power deficits." *Id*. at 264.

Petitioner sent a message to her orthopedist on October 24, 2019 stating that she had had some relief, but that her shoulder pain was slowly starting to return. Ex. 3 at 287. She was prescribed Mobic. *Id*. at 286.

On October 30, 2019, Petitioner saw had a telemedicine appointment with her family medicine provider. Ex. 3 at 305. She reported that physical therapy was "so painful that she walks out in tears." *Id*. She reported pain of 8/10 that decreased to 4-5/10 with naproxen. *Id*. She was prescribed meloxicam and referred back to orthopedics. *Id*. at 306.

On November 7, 2019, Petitioner had a telemedicine appointment with her orthopedist. Ex. 3 at 322. Sher reported 8/10 pain radiating down to her forearm. *Id*. She did not find physical therapy helpful and said the co-pay for meloxicam was problematic. *Id*. Surgery was recommended. *Id*.

Petitioner got a second orthopedic opinion on November 12, 2019. Ex. 5 at 1. She reported her August flu shot and "painful pulsing throughout the day in the left upper arm." *Id*. She reported that physical therapy made the pain worse. *Id*. On exam, Petitioner had swelling and redness in her left arm, weakness, tenderness, and reduced range of motion of the shoulder. *Id*. She was diagnosed with tendinitis with mild tenosynovitis. *Id*. Surgery was again recommended. *Id*. at 2.

Petitioner had arthroscopic surgery on November 20, 2019. Ex. 5 at 3-4. The surgical procedures included manipulation under anesthesia, tenosynovectomy, bursectomy, lysis of adhesions, and a plasma-rich and stem-cell injection. *Id*. at 3. She returned for a post-operative exam on November 26, 2019. Ex. 5 at 5. She reported some pain and difficulty sleeping, but improving range of motion. *Id*. She was referred for physical therapy. *Id*.

Petitioner states she was "given a physical therapy chair that would move her shoulder" that she used for about 2 months along with home exercises. Ex. 1 at ¶23. She did not attend formal PT due to co-pay issues. *Id*.

On January 31, 2020, Petitioner followed up with her PCP. Ex. 3 at 361. She reported left arm pain that radiated to her left hand and left hand weakness (such that she could not grab anything in her left hand). *Id*. at 364. She reported pain of 6/10 and a "burning/tingling/numbness" sensation. *Id*. On exam, Petitioner "jumped with light palpation at the AC joint and anterior shoulder." *Id*. at 365. She had decreased range of motion of both shoulders and a weak left-hand grip compared to the right. *Id*. She also had decreased range of motion of the wrist and tenderness at the elbow. *Id*. She was instructed to see a physical therapist the same day and to follow up with orthopedics. *Id*.

On April 6, 2020, Petitioner saw a sports medicine specialist. Ex. 3 at 405. She reported pain with lifting her arm, weakness in her arm and hand, and tingling in her hand. *Id*. at 407. Petitioner stated that meloxicam, naproxen, and ibuprofen did not provide relief. *Id*. She was diagnosed with rotator cuff syndrome and left brachial radiculitis. *Id*. at 408. MRIs of her c-spine and brachial plexus were ordered. *Id*. She was prescribed prednisone and referred to physical therapy. *Id*. The doctor opined that her pain "appear[ed] multifactorial." *Id*. at 409.

4

Petitioner had a physical therapy initial evaluation on April 7, 2020, but did not return for further treatment. Ex. 3 at 421. Petitioner had no further left shoulder specific treatment.

On May 6, 2022 (2.5 years after vaccination), Petitioner was treated for right leg and left shoulder pain after a car accident. Ex. 7 at 156. On exam, she had mild tenderness and good range of motion of her left shoulder. *Id*. at 159. Petitioner was given crutches for her leg injury. *Id*. at 441.

Petitioner states in her affidavit that her injury impacted her ability to play with her young son, who was six-years-old. Ex. 1 at ¶25, 30. She described how she could not play catch/sports with him, could not care for him, could not drive him to school. *Id*. While she notes a "strong recovery" from surgery, she states her shoulder never returned to its pre-vaccination condition and feels "old compared to the rest of her body." *Id.* at ¶29.

### III.    The Parties' Arguments

Petitioner seeks an award of $115,000.00 for her pain and suffering. Mot. at 21. She argues that her SIRVA injury was "severe" causing significant pain throughout her treatment course, including after her surgery. *Id*. She notes that her injury was complicated by her cellulitis, which required both injected and oral antibiotics. *Id*. Further, Petitioner states that her pain and suffering was increased because of the impact of her injury on her ability to care for her young child as a single mother. *Id*.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with awards ranging from $112,500.00 to $113,000.00, making her demand reasonable. Mot. at 17-22. Petitioner also requests reimbursement of $5,002.58 in out-of-pocket expenses due to her orthopedist for rehabilitation items, such as a cold therapy unit, an ultra-sling, home exercise equipment, and a passive continuous motion exercise device, that she used after her shoulder surgery. Supp. at 1; Ex. 9.

#### a.  Respondent

Respondent argues that Petitioner's damages request is "excessive" and proposes an award of $77,500 for pain and suffering. Resp. at 2. He characterizes Petitioner's injury as "mild to moderate," even though she had surgery. *Id*. at 8. He notes the relatively short duration of Petitioner's treatment in support of his argument. *Id*.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, and discussed three other prior SIRVA cases, which involved injured claimants with awards ranging from $95,000.00 to $97,500.00 in pain and suffering. *Id*. at 9-13. Respondent argued that

Petitioner's case was less severe than the cases cited, due to her recovery in less than one year after her vaccination, her "limited conservative treatment," and surgery. *Id*. at 13.

Respondent did not take a position in his response or at the hearing regarding Petitioner's requested reimbursement for out-of-pocket expenses.

### IV.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with

my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## V.    Prior SIRVA Compensation Within SPU[5]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also*

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do

determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[9] Agreement |
|---|---|---|---|---|
| Total Cases | *235* | *2,044* | *29* | *1,708* |
| Lowest | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| 1st Quartile | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| Median | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| 3rd Quartile | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B. Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI.    Appropriate Compensation for Petitioner's Pain and Suffering

When determining a petitioner's pain and suffering award, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

adjudicating these cases. However, Petitioner's circumstances will ultimately form my determination in this case.

There is no dispute about Petitioner's awareness of her pain and suffering, and the parties generally agree on her course of treatment. Petitioner sought treatment for pain, bruising, itching and a rash at the injection site eleven days after her vaccination. Ex. 3 at 138-141. She was prescribed both oral and injected antibiotics for cellulitis and naproxen for shoulder pain. Ex. 3 at 141, 175; Ex. 4 at 4. She continued to treat her SIRVA symptoms consistently, with one MRI, one cortisone injection, five physical therapy treatments, arthroscopic surgery, and at-home post-surgical rehabilitation for approximately 7.5 months after her vaccination. *See e.g.,* Ex. 3 at 218, 262-322; Ex. 4 at 8-9; Ex. 5 at 3-4. She complained of high levels of pain that improved after her surgery three months post-vaccination. *See e.g.*, Ex. 3 at 195, 217, 306, 361; Ex. 5 at 5. Overall, her course of treatment suggests a serious SIRVA injury of relatively short duration.

Petitioner argues that her SIRVA was acutely serious, with a cellulitis diagnosis in addition to SIRVA. Br. at 8-9. She notes that she reported high levels of pain and suffered impacts related to parenting her young son. *Id*. at 16. Respondent, by contrast, highlights that Petitioner's treatment course was relatively limited and over a short duration, less than one year. Resp. at 13. In support, Respondent relies on *Shelton v. Secretary of Health and Human Services,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021), *Hunt v. Secretary of Health and Human Services*, No. 19-1003V, 2022 WL 2826662f (Fed. Cl. Spec. Mstr. June 16, 2022), and *Cain v. Sec'y of Health & Human Servs.*, No. 19-1817V, 2023 WL 8539386 (Fed. Cl. Spec. Mstr. Nov. 13, 2023) in which the petitioners were awarded $95,000.00 to $97,500.00 in pain and suffering despite undergoing surgery for their SIRVA injuries. Resp. at 11-13. However, these cases are outliers, with specific circumstances that impacted the award. No such circumstances are present in this case as Ms. Blanco sought treatment within 11 days of her vaccination, reported high levels of pain, and did not have significant gaps in treatment.

Although both parties provided prior reasoned decisions to support their proposed pain and suffering awards, Petitioner's cases (particularly *Barry v. Sec'y of Health & Human Servs.*, No. 20-1874V, 2023 WL 4742421 (Fed. Cl. Spec. Mstr. June 23, 2023)) are more helpful. The petitioner in *Barry* sought treatment for her SIRVA injury eight weeks after vaccination and reported moderate pain. *Id*. at *2. She had four cortisone injections, 24 physical therapy treatments, and an arthroscopic surgery over approximately 8.5 months. *Id*. Ms. Barry was also the mother of two toddlers at the time of her injury and the impacts on her ability to provide care to small children impacted her pain and suffering award of $113,000.00. *Id.* at *6. Ms. Blanco had treatment of similar duration and was also a single mother to a young child at the time of her injury. While she had fewer cortisone injections and physical therapy treatments, she sought treatment

more quickly and reported higher levels of pain than did Ms. Barry. Further, I accept that Ms. Blanco substituted at least some post-surgery physical therapy with a continuous motion device and home exercises.

Thus, I find that **$113,000.00**, the same award as in *Barry*, is a fair and appropriate award for Petitioner's pain and suffering in this case.

## VII.    Appropriate Compensation for Petitioner's Past Medical Expenses

Petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Petitioner seeks reimbursement of $5,002.58 in out-of-pocket expenses incurred for rehabilitation items, such a cold therapy unit, an ultra-sling, home exercise equipment, and a passive continuous motion exercise device, that she used after her shoulder surgery. Supp. at 1; Ex. 9. Respondent did not take a position regarding Petitioner's requested expenses. *See* ECF No. 41.

Petitioner has provided a copy of her health insurance policy with Kaiser – Kaiser Permanente Traditional HMO Plan. Ex. 10. Petitioner's health care plan does not provide coverage for providers outside of the Kaiser network. *See id.* Petitioner's orthopedist, Dr. Rajagopalan is not an in-network provider with Kaiser Permanente. *See* Ex. 5, 9. Further, Petitioner's orthopedist recommended range of motion exercises after her surgery, which were accomplished with the medical equipment rather than formal physical therapy. *See* Ex. 1 at ¶23; Ex. 5 at 5.

Therefore, I find that Petitioner has provided preponderant evidence that the expenses incurred were both reasonably necessary and are not reimbursable by a third party. Accordingly, I award Petitioner **$5,002.58** as compensation for her past unreimbursed expenses.

## Conclusion

In light of all of the above, the I award **Petitioner a lump sum payment of <u>$118,002.58</u>, comprised of $113,000.00 for her pain and suffering and $5,002.58 for her past unreimbursed expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, <u>Rocio Blanco</u>.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.